R. SCOTT YOUNG (10695)
MELINDA K. BOWEN (13150)
HAILEY WINN (20420)
**SPENCER FANE LLP**
10 Exchange Place, 11th Floor
Salt Lake City, Utah 84111
Telephone: (801) 521-9000
rsyoung@spencerfane.com
mbowen@spencerfane.com
hwinn@spencerfane.com
*Attorneys for Defendants Benjamin Paul Schneider, Reckless Ben LLC, and Victor Nguyen*

---

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH**

| | |
|---|---|
| BAM FRANCHISING, INC., AMMON MCNEFF, MATTHEW MCNEFF, JOSH JOHNSON, BRANDON BEST, BAKER BRICKS, LLC, dba SALEM-BAKER BRICKS, INC.,<br><br>Plaintiffs,<br><br>vs.<br><br>BENJAMIN PAUL SCHNEIDER, RECKLESS BEN LLC, BRYAN MANSELL, and VICTOR NGUYEN,<br><br>Defendants. | **DEFENDANTS BENJAMIN PAUL SCHNEIDER, VICTOR NGUYEN, AND RECKLESS BEN LLC'S SPECIAL MOTION FOR EXPEDITED RELIEF AND FOR PARTIAL DISMISSAL OF PLAINTIFFS' VERIFIED COMPLAINT**<br><br>Case No. 2:26cv593<br><br>Judge David Barlow |

Defendants Benjamin Paul Schneider, Reckless Ben LLC, and Victor Nguyen (collectively, "Reckless Ben") respectfully submit this Special Motion for Expedited Relief and for Partial Dismissal of Plaintiffs' Verified Complaint.

**INTRODUCTION**

Reckless Ben, an investigative filmmaker and content creator, investigated a story at the request of viewer Bryan Mansell, who had not been paid for a LEGO collection his family collected for years and then arranged to sell by consignment at a Bricks & MiniFigs (BAM) store in Salem, Oregon. After various fact-finding efforts, Reckless Ben created satirical videos portraying what he had learned. The videos depict interactions with Plaintiffs and opinions about the situation, including the overall conclusion that Plaintiffs "stole" the Mansells' LEGOs. The videos did what journalism is meant to do—they drew attention to a piece of news.

Plaintiffs do not like that Reckless Ben highlighted the Mansells' predicament, the methods used, and the publicity generated by the videos. But Plaintiffs cannot weaponize the courts to suppress Reckless Ben's work or his First Amendment rights, particularly where Plaintiffs have now "recognize[d] that the Mansell family experienced a genuine loss," as reported by Reckless Ben. *See* Ex.1, https://bricksandminifigs.com/blog/resolution-reached-bricks-minifigs-and-mansell-family-settle-consignment-of-rare-collection-through-voluntary-mediation/.

Utah's Uniform Public Expression Protection Act (UPEPA), Utah Code section 78B-25-101 et seq., is meant to prevent precisely this type of effort. UPEPA is "an 'anti-SLAPP' act" or a statute protecting parties faced with a "Strategic Lawsuit Against Public Participation." *UHS of Provo Canyon, Inc. v. Bliss*, 2024 WL 4279243, at *3 (D. Utah Sept. 24, 2024). Although "SLAPPs are often cloaked as otherwise standard claims of defamation, civil conspiracy, tortious interference, nuisance, and invasion of privacy, just to name a few," UPEPA combats the misuse of such claims to avoid the "unifying features" of SLAPPs, which "make them a dangerous force"

by "ensnar[ing] their targets in costly litigation that chills society from engaging in constitutionally protected activity." *Id.* (cleaned up).

The same dangerous features exist here, but Plaintiffs took additional steps to chill protected speech. Faced with negative exposure, Plaintiffs filed this lawsuit and immediately sought an overreaching temporary restraining order (TRO) based on assertions of fact in a Verified Complaint. Reckless Ben had no opportunity to object to the TRO but was immediately prohibited from speaking about the evolving story, violating his First Amendment rights and impairing his livelihood. At the same time, Plaintiffs freely spoke about the situation, attempting (unsuccessfully) to convince the world they had done nothing wrong. In doing so, however, Plaintiffs directly contradicted key allegations they made in filing this suit and obtaining the TRO. While this unfolded, Reckless Ben was silenced by a TRO that operated as a gag order.

Although the TRO has since been amended by stipulation, Plaintiffs have not abandoned their suit. Despite admissions undermining their case and despite multiple significant flaws with the claims, Plaintiffs persist with thirteen causes of action, most of which fail as a matter of law but will inevitably require substantial costs to defend.

The Court should stop this quintessential SLAPP effort by applying UPEPA and dismissing most of Plaintiffs' claims. UPEPA applies because Reckless Ben's videos are protected speech and cover a topic intriguing millions of people. Further, Plaintiffs' primary claims fail as a legal matter, particularly those where UPEPA has greatest force. Reckless Ben's videos cannot support a civil RICO claim or any defamation-based claims, because Plaintiffs have not identified any specific defamatory statements and/or because Reckless Ben truthfully reported that BAM stole the Mansells' LEGOs. Specifically, BAM took over the Salem store, and a video shows the prior owner, Chrystal

Law, inform BAM representative Brian Best, "He [Mr. Mansell] has not been paid his percentage yet. And if I don't have the tickets, I won't know how much I need to pay him." https://www.youtube.com/watch?v=VKfQkRbd15k&t=1779s, at 44:27-44:35, Ex. 2.




Another BAM representative responded, "Okay, so so Chrystal, **<u>ultimately also is that that's a business thing</u>** and not necessarily yours. <u>Brandon will take, and because he's taking on the business he takes on all that **consignment**</u>." *Id.* at 44:35-44:50 (emphasis added), Ex. 2.




BAM now admits "the Mansells experienced a genuine loss and a great deal of uncertainty and frustration" and has agreed to dismiss all claims against Mr. Mansell and to pay for the LEGO collection at issue. *See* Ex. 3, https://bricksandminifigs.com/blog/press-release-bam-franchising-and-mansell-family-reach-resolution-over-star-wars-collection-dispute/. In public statements, including a joint statement with the Mansells, BAM confirmed it paid a settlement amount and "issued an

unqualified apology to the Mansell family for the losses and pain suffered from the events surrounding this dispute." *See* Ex. 1, https://bricksandminifigs.com/blog/resolution-reached-bricks-minifigs-and-mansell-family-settle-consignment-of-rare-collection-through-voluntary-mediation/. With payments for the property at issue and unequivocal apologies, Reckless Ben correctly reported that BAM "stole" the LEGOs, to the extent such statements can be deemed defamatory at all. As such, BAM's claims based on defamation must fail.

Thus, the Court should dismiss Plaintiffs' RICO and defamation-based claims with prejudice. To the extent the Court agrees and dismisses any part of the Verified Complaint, UPEPA also requires Plaintiffs to pay Reckless Ben's attorneys' fees and costs incurred in litigating this motion.

## STATEMENT OF FACTS[1]

1. In their Verified Complaint,[2] Plaintiffs assert thirteen claims, primarily based on a series of online videos (Compl. ¶ 66):

[1] Reckless Ben summarizes Plaintiffs' allegations in their Verified Complaint and in other documents the Court may consider on a motion to dismiss, including court documents, public records, and materials on which Plaintiffs rely. *See Stan Lee Media, Inc. v. Walt Disney Co.*, 774 F.3d 1292, 1298 n.2 (10th Cir. 2014) (concluding courts may take judicial notice of "documents and docket materials filed in other courts"); *Tal v. Hogan*, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006) (same for public records). *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) (same for documents "referred to in the complaint and . . . central to the plaintiff's claim").

This fact section does not address Plaintiffs' claims and statements that are not relevant to this motion, including those related to alleged tortious interference, civil stalking, nuisance, trespass, declaratory judgment, and injunctive relief. Although such claims are not addressed now, Reckless Ben disputes all of Plaintiffs' claims and allegations. Reckless Ben restates certain allegations here solely for purposes of this motion and reserves the right to deny all claims after this motion is decided. At that time, Reckless Ben will also file counterclaims against Plaintiffs and reserves the right to do so.

[2] The Complaint is verified by BAM CEO Ammon McNeff and BAM representative and store owner Josh Johnson. Compl. at 94-95.

a. On May 21, 2026, Reckless Ben posted "I tracked down the thief who stole $200,000 of LEGO". https://www.youtube.com/watch?v=wscQpkcwgNU&t=741s (approximately 7.9 million views to date), Ex. 4.

b. Also on May 21, Reckless Ben posted "Lego Video Part 2" to Patreon, later posted to YouTube as "I got arrested because of legos" on May 30. https://www.youtube.com/watch?v=cxZPfj8AlmY (about 5.2 million views), Ex. 5.

c. The same day, Reckless Ben posted "I Got Arrested Investigating a LEGO Store". https://www.youtube.com/watch?v=NbrAtL7v_Vs (about 429,000 views), Ex. 6.

d. On May 23, Reckless Ben addressed BAM's response to the videos above. https://www.youtube.com/watch?v=bWg2bnAqW6k&t=80s (about 2.5 million views), Ex. 7.

e. On May 30, Reckless Ben responded to a video posted by the American Fork Police. https://www.youtube.com/watch?v=2YEzhDn0jY8 (about 3.8 million views), Ex. 8.

f. On June 4, after the case was filed, Reckless Ben also posted a video "All the footage is released!". https://www.youtube.com/watch?v=Ih2XwNN0aVY (about 4.9 million views), Ex. 9.

g. On June 9, Reckless Ben posted "My final message". https://www.youtube.com/watch?v=sISjfdueTYg (about 5.4 million views), Ex. 10.

2. Each Reckless Ben defendant allegedly participated in the videos, including Benjamin Schneider, "an online paid streaming content creator and publisher"; Reckless Ben LLC, the company "controlled and/or operated by Schneider"; and Victor Nguyen, an employee or other agent of Mr. Schneider and/or Reckless Ben LLC. Compl. ¶¶ 7-9.

3. Reckless Ben's Patreon profile explains his investigative journalism:




*See* https://www.patreon.com/c/RecklessBen/posts.

4. The June 9 video was titled Reckless Ben's "final message" because Plaintiffs obtained the TRO on May 28, 2026, with no opportunity for Reckless Ben to respond because he had not been served. The TRO and the Verified Complaint were both served on Reckless Ben via email on June 8, 2026. *See* State Court TRO, Ex. 12; Order of Alternative Serv., Ex. 13.

5. The TRO included sweeping provisions that prevented Reckless Ben from speaking about Plaintiffs or the issues in this case. *See* Ex. 12. At the same time, as explained below, Plaintiffs continued to speak and spread their own narrative about the underlying events, which began with a consignment agreement between Bryan Mansell and the BAM franchise in Salem, Oregon. Mr. Mansell's father had curated a significant collection of Star Wars LEGO items and in 2023 decided "it was time to divest." *See* Compl. ¶ 34. Bryan Mansell thus visited the Salem BAM

store for his father and asked for help in selling the collection. The then owner of the store, Chrystal Law, agreed to display and sell the items via a consignment agreement. *See id.* ¶¶ 31, 34.

6. The store publicized the collection on Reddit on November 7, 2023:




7. As BAM itself stated, "For approximately one year, Bryan visited the store monthly around the 15th to collect paper receipts and a check for his share of sales. He received approximately $15,000 in total payments during this period." https://bricksandminifigs.com/blog/blog/2026/06/04/bricks-and-minifigs-salem-store-timeline/, Ex. 14.

8. In October or November 2024, a dispute arose between Ms. Law and BAM, resulting in BAM taking possession of the Salem store on November 14, 2024. *See id.*

9. "BAM's representative, Brandon [Best,] conducted an informal and video inventory" at that time. Compl. ¶ 29. Plaintiffs claim Mr. Best "did not locate or identify any product that was identified as consigned or not owned by Salem LLC" but at the same time allege "[l]ess than $5,000 worth of Star Wars LEGO product could be located." *Id.*

10. BAM then owned and managed the store through "the first quarter of 2025, [when] Josh [Johnson] and Brandon [Best] agreed to clean up, manage, and operate the BAM repossessed store in Salem, which was subsequently sold and transferred, along with the store's assets, to Baker Salem (i.e., owned by Josh and Brandon)." *Id.* ¶ 45.

11. BAM claims it "repossessed the store without any actual knowledge of Bryan's purported consignment claim." *Id.* That is, Plaintiffs contend BAM was a bona fide purchaser, "without notice of any third party claims or liens of any kind." *Id.* ¶ 28.

12. Public records exposed by Reckless Ben show otherwise, as do Plaintiffs' own interviews. For instance, Mr. Best's video of the store on November 14, 2024, shows many Star Wars LEGO items had been taken from the shelves; Matt McNeff, BAM's CFO, confirmed the same in an interview with online creator, Coffeezilla, which has since been viewed over eight million times. *See* https://www.youtube.com/watch?v=VKfQkRbd15k&t=2252s, Ex. 2.

13. When pressed, Matt McNeff admitted that BAM's inventory list did not include photos of LEGO items that Ms. Law had taken that belonged to the Mansells. ("#169 I'm not seeing, so this is not on our list … [#10240] not seeing that one either … [#9493] I don't see that one either."). Mr. McNeff further admitted, "So, maybe those were locked at the time and Brandon did not get those pictures." *Id.* 17:30-17:50. As Coffeezilla noted, "That's kind of a problem because the Gormans had over 200 photos of this sort … There's a lot more LEGOs in the Gormans' photos that Corporate didn't show." *Id.* 17:50-18:00. This led Mr. McNeff to state, "Where's the rest of it? You got me. I don't know." *Id.* 18:30-18:37.

14. Although BAM contends it had no notice of a consigned LEGO collection, a Ring video from the store on November 14, 2024, shows this is not true. In the video, Ms. Law states,

"[Mr. Mansell] has not been paid his percentage yet. And if I don't have the tickets, I won't know how much I need to pay him." *Id.* 44:27-44:35. BAM's representative (on the phone held by Mr. Best) responds, "Okay, so so Chrystal, ultimately also is that that's a business thing and not necessarily yours. **Brandon will take, and because he's taking on the business he takes on all that consignment**." *Id.* 44:35-44:50 (emphasis added). Tellingly, BAM's representatives never said Mr. Mansell's consignment was unauthorized or invalid. *See id.*

15. Although it is still unclear what happened to the Mansells' remaining LEGOs,[3] Plaintiffs now blame Ms. Law for "fail[ing] and refus[ing] to pay Bryan monies that may have been due to him under the Consignment Agreement." Compl. ¶ 38. Even with this change in narrative and even with conflicting stories, the undisputed facts remain: after BAM took over the Salem store, it did not return or pay for the Mansells' items.

16. Mr. Mansell attempted unsuccessfully to address the issue directly with Plaintiffs and then turned to Reckless Ben for help. Mr. Mansell explained that he had consigned approximately $200,000 worth of Star Wars LEGO collectibles and that BAM would not return the items or pay him for what it had sold. This report led to the Reckless Ben investigation and the resulting videos. *See supra* ¶ 1.

[3] One theory is that BAM removed what remained of the collection on November 14, 2024, with a U-Haul. Matt McNeff flatly denied this in his interview with Coffeezilla. https://www. https://bricksandminifigs.com/about-us//watch?v=VKfQkRbd15k&t=2252s, Ex. 2. 18:37-18:40. He asserted that, when Mr. Best came to the Salem store, "it was in a rental car, not in a U-Haul." *Id.* 19:15-19:20. When confronted with a picture showing a U-Haul in front of the store, Ammon McNeff backpedaled, admitted Mr. Best had a U-Haul, and claimed that the U-Haul was used only to tow a camping trailer *See id.* 27:20-40. But an anonymous caller stated he was a former BAM employee present at a Eugene, Oregon BAM store where Mr. Best brought a U-Haul the same night, which held Star Wars LEGOs, and "[Mr. Best] said 'We're just gonna hold onto this stuff until Corporate tells us where we got to distribute it.'" *Id.* 21:30-21:57.

17. After filing this suit on May 27, 2026, and after obtaining the TRO the next day, Plaintiffs made several public statements in addition to the Coffeezilla interview:

a. On May 29, Ammon McNeff appeared in "Bricks & Minifigs CEO Answers YOUR Questions!". https://www.youtube.com/watch?v=9dmR3Flk49k (about 142,000 views), Ex. 15.

b. On May 30, Mr. McNeff again attempted to tell his version of events. *See* https://www.youtube.com/watch?v=AnS-GGmC6jM (about 18,000 views), Ex. 16.

c. On June 4, Fox 5 posted an interview with Mr. McNeff. *See* https://www.youtube.com/watch?v=_01kgM7xSVc (about 223,000 views), Ex. 17. In this video, Mr. McNeff attempted to portray Plaintiffs as innocent victims but admitted they had at least some of Mr. Mansell's LEGOs, possessed documents detailing the collection, and needed to "make [Mr. Mansell] whole." Examples of Mr. McNeff's admissions are detailed below.

i. "If there have been missteps through the transition of the store, we want to make things right, we want to do what's right by the customer." *Id.* 2:02.

ii. "Whatever was left over, we've offered that on multiple occasions." *Id.* 2:30.

iii. "If there was anything that had been done that was untoward by the previous franchisee. If that individual had sold more than they let on, and did not pay Mr. Mansell, we have offered to compensate him for the loss of the compensation that should have been given to him." *Id.* 2:35.

iv. "There was some initial findings that, hey, these seem to match some of the things that were being stated." *Id.* 3:27.

v. "We were able to determine some other indicators later, so all of those were set aside to say hey, these may match, so let's set them aside in case, you know, like, we can work together. Those then were offered to him and the initial offer was rejected." *Id.* 3:36.

vi. "But, then as we've continued, we've found documentation that shows that there were separate sets of books and spreadsheets being kept from the former franchisee. As those things have come to light, we've attempted to share those with Mr. Mansell in hopes that he can see that we were not attempting in any way, shape or form to withhold anything that we could verify and that we do want to help him recover as much of the collection." *Id.* 3:53.

vii. "The actual factual information shows that the value of the, the more realistic value of the collection was closer to about $100,000, which is what the documentation that we've been able to determine, that both parties to that consignment agreement kind of had an understanding between each other that that was the actual real value." *Id.* 3:58.

viii. "We found three separate sets of records that were being kept that show that Mr. Mansell was significantly underpaid by that former franchisee." *Id.* 6:20.

ix. "The overall payments to him did not match what had been sold through the store." *Id.* 7:15.

x. "Our number one priority right now is to ensure that he gets made whole. With the underreporting that took place, and the documents that we now have that show what actually went on, we know that we have a responsibility to work with him to make sure that he does get made whole." *Id.* 10:54.[4]

18. In addition to the above examples, various commentators (other than Reckless Ben) have created extensive content about this same story. *See, e.g.,* Ex. 18, https://www.youtube.com/watch?v=wgq3ca7ewd8 (over 2.3 million views).

19. Despite their own participation in the dialog and despite the content from myriad third parties, Plaintiffs allege in this suit that Reckless Ben's videos resulted from a conspiracy to "defraud, manipulate, threaten, trespass, extort, injure and damage Plaintiffs." Compl. ¶ 9.

20. Plaintiffs, however, recently settled their claims against Bryan Mansell, agreeing to pay Mr. Mansell a settlement amount and "issu[ing] an unqualified apology to the Mansell family for the losses and pain suffered from the events surrounding this dispute." *See* Ex.1, https://bricksandminifigs.com/blog/resolution-reached-bricks-minifigs-and-mansell-family-settle-consignment-of-rare-collection-through-voluntary-mediation/.

**STANDARD**

A party served with a SLAPP like this case "may file a special motion for expedited relief to dismiss the cause of action or part of the cause of action." Utah Code § 78B-25-103. The Court

[4] These citations reflect only a sample of Plaintiffs' admissions in materials circulating online.

must then hear the motion within sixty days unless it orders a later hearing for good cause or to allow limited discovery. *Id.* § 78B-25-105. In deciding the motion, "UPEPA requires a two-part analysis": the Court must decide (1) "whether UPEPA applies to the action" and (2) "whether [the plaintiff] has a legally viable cause of action." *Bliss*, 2024 WL 4279243, at *4.

The first step includes two sub-issues, with UPEPA applying (1) "to a cause of action asserted in a civil action against a person based on the person's . . . exercise of the right of freedom of speech or of the press" and (2) when such conduct addresses a matter of public concern. Utah Code § 78B-25-102(2)(c). If the Court resolves these two issues in the movant's favor, UPEPA applies, and the Court must then turn to the merits of the relevant claims and assess "the legal viability of [the] underlying claim presented in the pleading." *Lewis v. U.S. Bank Trust NA,* 2020 UT App 55, ¶ 9, 463 P.3d 694. Although the Court typically "assum[es] the truth of the allegations in the complaint and draw[s] all reasonable inferences therefrom in the light most favorable to the plaintiff", *Hudgens v. Prosper, Inc.*, 2010 UT 68, ¶ 14, 275 P.3d 1024, this rule does not apply to defamation-based claims. *See RainFocus Inc. v. Cvent Inc.,* 2023 UT App 32, ¶ 6, 528 P.3d 1221. Instead,

> to accommodate the respect we accord its protections of speech, the First Amendment's presence merits altering our customary rules of review by denying a nonmoving party the benefit of a favorable interpretation of factual inferences. Rather, we look to the context of the allegedly defamatory statement and then, in a nondeferential manner, reach an independent conclusion about the statement's susceptibility to a defamatory interpretation.

*Id.* (quotation and citation omitted).

## ARGUMENT

Applying UPEPA and Rule 12(b)(6), Plaintiffs' first cause of action under RICO should be dismissed with prejudice for failure to state a claim, as should all defamation-based claims, including Plaintiffs' second, third, fourth, fifth, tenth, and eleventh causes of action.

## I. UPEPA APPLIES TO THIS SLAPP.

As a first step, the Court must determine whether UPEPA applies, which requires a relatively simple analysis in this case.

First, there should be no dispute that Plaintiffs' claims are based on Reckless Ben's exercise of his freedom of speech. This "is not an inquiry into whether the defendant's conduct was wrongful"; instead, the inquiry "focuses on the nature of the conduct." *Bliss*, 2024 WL 4279243, at *4 (cleaned up). And it is established that "obtaining information and footage with the intent to disseminate to millions of potential viewers . . . is 'speech' for First Amendment purposes." *Id.*

Here, just as in *Bliss*, Plaintiffs' claims are based on Reckless Ben's investigation and related videos. *See, e.g.*, Compl. ¶¶ 66-73. And, as the *Bliss* court determined, such "conduct in gathering facts to further public debate . . . is speech under the First Amendment and is of the sort protected by UPEPA." 2024 WL 4279243, at *5.

Second, Reckless Ben's speech deals with matters of public concern. Although Plaintiffs attempt in the Verified Complaint to paint the issues as "private" matters, a "matter of public concern" under UPEPA is broadly one "of interest to the community, whether for social, political, or other reasons." *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1224 (10th Cir. 2000). That is, speech "deals with matters of public concern . . . when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011). Such speech "is at the heart of the First Amendment's protection." *Id.* at 451-52.

In *Bliss*, the plaintiff's "actions, business model, tactics, and treatment of vulnerable populations [were] matters of public concern, as [was] evident from the repeated news coverage, public documentaries, and recent legislation." 2024 WL 4279243, at *5. The defendant was an

online content creator working on a story about the plaintiff's operations, which the court concluded were "currently of interest to the community and the legitimate subject of news interest" related to "an industry that ha[d] become a matter of public concern." *Id.*

The allegations here are materially identical. Reckless Ben is an online content creator who investigated theft by a corporation with "over 130 Bricks & Minifigs locations across the United States and Canada." *See* Ex. 19, https://bricksandminifigs.com/about-us/. He created videos and raised awareness about BAM's handling of the Mansells' LEGO collection. Reckless Ben's first relevant video had over 1.3 million views in less than a week. *See* Compl. ¶ 65. To date, this video alone has over 6.9 million views. *See* https://www.youtube.com/watch?v=wscQpkcwgNU, Ex. 4. Other Reckless Ben videos have also generated significant public interest. Many other reporters have also discussed the issue, all with thousands or even millions of views. *See* Statement of Facts, *supra*. The videos also cover matters that the public cares about generally, such as consumer protection, business practices and accountability, police conduct, and restrictions on reporting. Under these circumstances, the issues raised by Reckless Ben's reporting have become or always have been matters of public interest, and UPEPA applies.

## II. SEVERAL CAUSES OF ACTION SHOULD BE DISMISSED.

Under UPEPA, the next step requires the Court to evaluate the merits of Plaintiffs' claims. For all the reasons discussed below, Plaintiffs cannot sustain many of their claims.

**A. Plaintiffs' RICO claim fails as a matter of law.**

Plaintiffs first assert civil RICO violations,[5] which require "(1) investment in, control of, or conduct of (2) an enterprise (3) through a pattern (4) of racketeering activity." *Gaddy v. Corp. of Pres. of Church of Jesus Christ of Latter-day Saints*, 665 F. Supp. 3d 1263, 1294-95 (D. Utah 2023). Plaintiffs' allegations cannot support these elements.

**i. Reckless Ben did not violate RICO by exposing corporate theft.**

As explained in detail above, to the extent Reckless Ben's videos include any objectively verifiable statements, the videos merely expose BAM's theft of and/or failure to pay for the Mansells' LEGOs. The videos from November 14, 2024, show BAM took possession of the Salem store with knowledge of the Mansells' consignment arrangement. Despite this, BAM did not return the LEGOs or pay the Mansells in the intervening 21+ months. BAM has now also confirmed the Mansells' "genuine losses" that have now been compensated *by BAM*. Reckless Ben's truthful investigative reporting on the same issues cannot sustain a RICO claim.

**ii. There cannot be an enterprise in this case.**

With respect to the second element, an "enterprise" under RICO includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 USC § 1961(4). "[A]n association-in-fact

---

[5] Because Plaintiffs asserted this claim originally in state court before removal, the Verified Complaint cites Utah's Pattern of Unlawful Activity Act (UPUAA). UPUAA "is modeled after the federal Racketeer Influenced and Corrupt Organizations Act (RICO)," and both involve the same statutory interpretations. *State v. Squires*, 2019 UT App 113, ¶ 50, 446 P.3d 581. Further, "the Utah Supreme Court often considers federal case law on RICO claims when analyzing comparable UPUAA provisions." *Roberts v. C.R. England, Inc.*, 318 F.R.D. 457, 490 (D. Utah 2017) (cleaned up). Accordingly, this motion cites federal case law interpreting the federal RICO statute despite Plaintiffs' original reliance on UPUAA.

enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946, (2009); *see also Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 388 (7th Cir. 2010) (dismissing RICO claim where plaintiff alleged "just a conspiracy, . . . rather than anything that looks even remotely like an enterprise, however informal; for there was no structure, organization, or leadership").

Here, Plaintiffs assert that Mr. Schneider, Mr. Nguyen, and Reckless Ben LLC (all members of the "Schneider Group"), conspired with Mr. Mansell and with Ms. Law and Benjamin Gorman. *See* Compl. ¶ 9. But these parties cannot be part of an enterprise as a matter of law.

First, BAM cannot include Mr. Mansell as a "co-conspirator" where BAM has now admitted the Mansells were the one injured here and where BAM has paid a settlement in line with its admissions and unequivocal apologies.

Further, the "Schneider Group" and its agents cannot constitute an enterprise. In *Roberts v. C.R. England, Inc.*, the plaintiffs failed to allege a legal enterprise where the plaintiffs relied on drivers who were independent contractors, who acted under the defendant's control, and who were also alleged victims. 318 F.R.D. 457, 486 (D. Utah 2017). These drivers could not be part of an "enterprise" because plaintiffs "may not circumvent the statutory requirement of a distinct person and enterprise by adding an agent or employee to the definition of enterprise." *Id.* (cleaned up).

In this case, Plaintiffs acknowledge that Reckless Ben LLC is operated by Mr. Schneider. *See* Compl. ¶ 8. Mr. Nguyen is also allegedly an agent of Mr. Schneider or Reckless Ben LLC. *See id.* ¶ 9. With these assertions that the Reckless Ben defendants are all agents of one another, Plaintiffs cannot manufacture an enterprise by grouping them together.

Plaintiffs also cannot cure the defect by referencing Mr. Mansell, Ms. Law, or Mr. Gorman. Plaintiffs do not plead facts showing that any of these individuals formed part of a continuing enterprise with a common purpose, defined relationships, and sufficient longevity. *See Boyle*, 556 U.S. at 946. Plaintiffs do not describe a stable group functioning as a ongoing unit; Plaintiffs do not identify specific relationships among the supposed participants beyond ordinary affiliation or assistance; and Plaintiffs do not allege any longevity that would extend beyond the finite dispute over a specific LEGO collection. At most, Plaintiffs provide conclusory allegations of "support." Such allegations fail to plead the structure required for a RICO enterprise.

**iii. Plaintiffs have not alleged a sufficient pattern of unlawful activity.**

Even if an enterprise could exist in this case, Plaintiffs also cannot establish the required "pattern of unlawful activity," which "means engaging in conduct that constitutes the commission of at least three episodes of unlawful activity, which episodes are not isolated, but have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics. Taken together, the episodes shall demonstrate continuing unlawful conduct and be related either to each other or to the enterprise." Utah Code § 76-17-401. The conduct alleged by Plaintiffs does not qualify as "unlawful conduct," and it falls far short of *continuing* unlawful conduct.

RICO first limits "unlawful activity" to enumerated acts. *See id.* § 76-17-401; 18 U.S.C § 1961. That is, Plaintiffs cannot rely on simple torts. By statute, "unlawful activity" does not include defamation, false light, trespass, harassment, or nuisance.

Further, Plaintiffs cannot demonstrate that any alleged qualifying unlawful activity actually occurred; the undisputed evidence refutes any such conclusion. For example, Plaintiffs plead theft

by extortion, stating that Defendants "threatened that matters would become 'very bad' if BAM did not pay; and by framing BAM's response options as either paying extorted sums (the 'easy way') or continued assaults, damages and utter destruction (the 'hard way'), illustrated by an explosion of BAM or its franchisees." Compl. ¶ 135(c). Under Utah Code section 76-6-406, however, theft by extortion occurs only when, among other things, an actor threatens to cause physical harm in the future to the person threatened, to any other person, or to property. But the Reckless Ben videos do not depict an actual threatened explosion. The video showed Ammon McNeff rejecting an offer to proceed in what Mr. Schneider termed "the easy way"; depicted an animated sign with the phrase "the easy way"; and showed *the sign* exploding to make room for a sign that said "the hard way." *See* https://www.youtube.com/watch?v=wscQpkcwgNU&t=4697s at 14:06-15:00, Ex. 4.

Plaintiffs misrepresent this satirical segment and allege that Mr. Schneider threatened physical harm because he referenced an explosion. But the video itself undermines Plaintiffs' attempts to paint the videos as containing threats of physical harm. The videos merely show that BAM itself decided not to accept an offer by Reckless Ben, and this decision effectively "blew up" a potential early resolution.

Reckless Ben never threatens physical or property harm in any of his videos. And without the alleged threats of physical harm as a qualifying statutory episode, Plaintiffs have not identified at least three other qualifying predicate acts that relate to each other or to the alleged enterprise and that, taken together, demonstrate continuing unlawful conduct.

Plaintiffs also cannot establish a pattern of unlawful activity because they have not alleged any threat of continuing activity. Even if Plaintiffs can prove that predicate acts occurred,

continuity remains essential. And, to establish continuity, Plaintiffs must plead either a closed-ended series of related predicates extending over a substantial time or an open-ended threat of continuing unlawful activity. *Hill v. Estate of Allred*, 2009 UT 28, ¶¶ 38, 41, 216 P.3d 929; *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241–42 (1989).

Plaintiffs do not rely on any allegations of an open-ended threat of continuing unlawful activity. Indeed, the Tenth Circuit has concluded there is no open-ended continuity when plaintiffs allege only "a closed-ended series of predicate acts constituting a single scheme . . . to accomplish a discrete goal . . . directed at a finite group of individuals . . . with no potential to extend to other persons or entities." *Boone v. Carlsbad Bancorporation, Inc.*, 972 F.2d 1545, 1556 (10th Cir. 1992).

Here, if Plaintiffs' allegations describe any scheme at all, it had a single, discrete goal of ensuring the Mansells recovered their LEGOs or related payments. The alleged conduct was directed at a limited group—namely, BAM and those involved in the consignment agreement. The Complaint does not plausibly suggest an ongoing threat that similar conduct would repeat in the future or be directed at anyone beyond those involved here.

If anything, Plaintiffs rely solely on closed-ended continuity that does not "threaten future repetition." *Johnson v. Heath*, 56 F.4th 851, 860 (10th Cir. 2022). Such cases "require[] a series of related racketeering acts over a 'substantial period of time.'" *Id.* (citing *H.J. Inc.*, 492 U.S. at 241–42). The necessary "substantial period" varies by case, but cases with the necessary period involve "fraudulent conduct lasting years, sometime over a decade. Such substantial time periods are consistent with Congress' intent to combat long-term criminal conduct." *Hughes v. Consol-Pennsylvania Coal Co.*, 945 F.2d 594, 611 (3d Cir. 1991).

Here, Plaintiffs allege activities beginning in November 2024 when BAM repossessed the Salem store and continuing through the publication of videos in May 2026. With only about eighteen months at issue, there is no long-term conduct that RICO can reach. *Cf. J.D. Marshall Int'l, Inc. v. Redstart, Inc.*, 935 F.2d 815, 820 (7th Cir. 1991) (deciding continuity did not exist for events spanning thirteen months); *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989) (seeing no "special threat to social well-being" for acts occurring "over approximately one year").

Without sufficient time to support closed-continuity, without any allegations of open-ended continuity, and without necessary predicate acts, Plaintiffs cannot establish the required pattern of unlawful activity. Plaintiffs also have not alleged a distinct enterprise. With either of these insufficiencies, Plaintiffs' RICO claim fails as a matter of law and should be dismissed with prejudice.

**B. All defamation-based claims must also be dismissed.**

The same result should follow for all claims related to or relying on alleged defamation, including Plaintiffs' second, third, fourth, fifth, tenth, and eleventh causes of action.

**i. None of the videos in this case can be considered defamatory.**

Plaintiffs have not identified any particular statement in any particular video that they consider defamatory. Plaintiffs instead rely on general allegations that Reckless Ben's videos are damaging because they assert that Plaintiffs "stole" from old people—specifically, from Bryan Mansell's father. This type of statement is not legally capable of supporting any claim based on defamation, particularly where it is undisputed the Mansells did in fact suffer "genuine losses."

This is true for all of Plaintiffs' defamation-based claims, including those for defamation per se, defamation, false light, conspiracy, intentional infliction of emotional distress, and unjust

enrichment. "Traditionally, in order to constitute defamation per se, the challenged statements must be false and allege criminal conduct on the part of the plaintiff . . . or conduct which is incongruous with the exercise of a lawful business, trade, profession, or office." *Jacob v. Bezzant*, 2009 UT 37, ¶ 26, 212 P.3d 535. And for all defamation claims, assertions of fact must be distinguished from expressions of opinion. *See Lichfield v. Kubler*, 2025 WL 2772468, at *4 (D. Utah Sept. 29, 2025) ("[A] plaintiff must show that the defendant stated or implied facts that are both false and defamatory."). As explained above, moreover, the Court may not construe allegations in Plaintiffs' favor when analyzing whether statements are defamatory in nature. *See RainFocus Inc.*, 2023 UT App 32, ¶ 6.

In *Lichfield*, the court analyzed a documentary series created about teenage behavior modification programs. Among other statements, the defendants asserted that operators of the relevant programs "seemed to get away with murder" and that one plaintiff had "abused" children and "conned" parents. *Id.* at *3. With respect to the first statement, the court concluded this was an opinion or "an expression of disapprobation that is not capable of being proved true or false." *Id.* at *5. The court reached a similar conclusion regarding the statements about children being abused and parents being conned, explaining there would be no way to objectively verify whether behavior was abusive or fraudulent. *See id.* The court further cited Supreme Court case law providing that even the term "blackmail" was not defamatory because "use of words that carry criminal connotations do not always constitute assertions of fact." *Id.* Although statements about specific crimes might be defamatory, a "generic statement about unspecified crimes . . . provides no temporal or other limitation that would hint at a particular crime." *Id.* at *6. Absent such specifics, and with statements made in an editorial publication (not a "hard news" source), the

statements were "best understood as rhetorical hyperbole." *Id.* The defendants may have expressed strong opinions akin to accusing the plaintiff of general crimes, but there was "not an assertion of provable fact." *Id.*

Just weeks ago, the Tenth Circuit affirmed the district court's ruling in *Lichfield*, holding that the statements at issue are "precisely the sort of subjective view that the Utah Constitution protects as a privileged opinion. And, similarly, under the First Amendment, she has stated 'evaluative opinions,' consisting of – at most 'rhetorical hyperbole'." *Lichfield v. Kubler*, 183 F.4th 1248 (10th Cir. 2026).

Plaintiffs rely on similarly generalized statements that BAM "stole" from the Mansells or that BAM "steals from old people." Like the terms "abuse," "con," or "blackmail," any number of crimes could be considered "stealing" generically. *See id.* at *14 (explaining that "abused" and "conned" both have "a broad range of meanings"). The videos react negatively to BAM's approach to the situation, but the reactions are opinions and/or satire, not facts. Also, the videos are editorial content, not hard news. *See West v. Thomson Newspapers*, 872 P.2d 999, 1020 (Utah 1994) (concluding editorial columns "as opposed to 'hard news'" contained protected opinions); *see also Lichfield*, 2026 WL 2146985, at *6 (explaining a statement is not defamatory if a reasonable viewer would not accept the statement at face value). It also bears repeating that BAM has not identified any *specific* defamatory statements of fact in their Complaint, leaving Defendants and the Court to rely on broad allegations. And the general concept that BAM "stole" something is not defamatory.

Importantly, "truth is [also] an absolute defense to an action for defamation." *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 57 (Utah 1991). If the relevant statement "is true in substance", any

"[i]nsignificant inaccuracies of expression do not defeat the defense of truth." *Id.* at 57-58. Because defamatory meaning—or lack thereof—can be determined as a legal matter, the Court may not need to wade into available evidence showing that Plaintiffs did, in substance, "steal" from the Mansells. But the evidence also supports this truth defense as a matter of law. And the Court can consider undisputed evidence on a UPEPA motion. *See* Utah Code § 78B-25-106 (allowing courts to review "any evidence that could be considered in ruling on a motion for summary judgment"). In addition, the Court can consider Plaintiffs' own admissions and apologies to the Mansell family in publicly available materials.

Such evidence and admissions establish the substantive truth of Reckless Ben's statements, to the extent they can be objectively verified. BAM's executives have repeatedly admitted that they still had LEGOs to return to the Mansells, that they are responsible to compensate the Mansells, and that the Mansells suffered genuine losses. And BAM has now accepted responsibility for those losses and has paid the Mansell family as a result. Thus, in substance, Plaintiffs admit they "stole" items in the Mansells' LEGO collection. *See* https://www.merriam-webster.com/dictionary/steal (including "to take the property of another wrongfully and especially as a habitual or regular practice" as a definition of "steal").

Plaintiffs' bona fide purchaser theory also fails based on publicly available materials. In particular, the Coffeezilla video—in which Plaintiffs participated—includes a phone call in which Ms. Law notifies BAM representatives of the Mansells' consigned items, and one BAM representative responds that "Brandon will take, and because he's taking on the business he takes on all that consignment." *See* Statement of Facts ¶¶ 13-15. With these admissions, the truth of Reckless Ben's relevant statements cannot be disputed, and Plaintiffs' defamation allegations fail.

If Plaintiffs cannot succeed in establishing defamation, other claims relying on the alleged defamatory conduct must also fail. As explained by the district court in *Lichfield*, "[t]he same principles that limit liability under defamation law also apply to false light claims" because "false light claims that arise from defamatory speech raise the same First Amendment concerns as are implicated by defamation claims." 2025 WL 2772468, at *8 (cleaned up). Thus, false light claims should be dismissed for the same reasons that support dismissal of the underlying defamation claims. Likewise, to the extent Plaintiffs based their allegations of civil conspiracy on the alleged defamation and false light, these allegations must also "fail as a matter of law" because Plaintiffs "cannot satisfy the unlawful acts element" of conspiracy. *Id.* at *9. With respect to Plaintiffs' tenth cause of action for intentional infliction of emotional distress (IIED), "a plaintiff may not attempt an end-run around First Amendment strictures protecting speech by instead suing for defamation-type damages under non-reputational tort claims." *Id.* at *8 (cleaned up). Thus, the IIED claim should be dismissed for the same reasons as the other defamation-based claims.

**ii. Plaintiffs' claims for IIED and unjust enrichment fail on other grounds.**

At the outset, multiple Plaintiffs are corporate entities that cannot experience emotion, including distress. Indeed, any entity plaintiffs "are—as a matter of law—incapable of succeeding on a claim for IIED." *Camco Constr. Inc. v. Utah Baseball Acad. Inc.*, 2018 UT App 78, ¶ 16, 424 P.3d 1154. Similarly, individuals cannot assert IIED where "the claim was made on behalf of a corporation or the claim was derivative of injury to a corporation." *Id.* ¶ 13. In the Complaint, Plaintiffs do not allege any distinct IIED injury to an individual; instead, all IIED claims are lumped together as to all Plaintiffs against all Defendants. *See* Compl. ¶¶ 201-05. With such allegations, the IIED claims from both corporate and individual Plaintiffs must be dismissed.

The IIED cause of action also fails because the alleged actions by the Reckless Ben defendants are not sufficiently egregious to support liability. To state an IIED claim, a plaintiff must allege "outrageous conduct" that rises to the level of "extraordinarily vile conduct, conduct that is atrocious, and utterly intolerable in a civilized community." *Id.* (cleaned up). Even accusing a teacher of throwing a rock at a student and throwing a student across a room into a wall "did not meet the 'high bar' for outrageous conduct to support an IIED claim." *Id.* By comparison, statements that executives seemed "to get away with murder" or that children were abused and parents were conned, were "milder" and could not prove IIED.

Here, Reckless Ben's statements are even milder than those at issue in *Lichfield*. Plaintiffs allege that Reckless Ben accused BAM of stealing and/or that Reckless Ben otherwise facilitated the relevant videos. Even if statements about "stealing" can be seen as defamatory—and they cannot—such conduct is not sufficiently "outrageous" and "extraordinarily vile" to support a claim for IIED. Thus, the IIED claim must be dismissed as a matter of law.

By contrast, Ammon McNeff made numerous statements to police that were false and defamatory, and these were recorded on body cameras and have now been posted online. For example, Mr. McNeff told police that Mr. Schneider has "clearly got some form of sociopathic disorder." *See* https://www.youtube.com/watch?v=pkfEXRqPD1s, 13:25-13:30, Ex. 20. He also told police,

> Honest to goodness, he's a sociopath. As we've done some additional searches on him, he has like it appears that a relative of his, he's originally from Ohio and then he moved to L.A. Some relative of his with the same name, based on what we can piece together, was convicted of child porn or child sexual contact, some of these other types of things. So, there's a very real chance that he may have been abused as a child. But that set him through a mental disorder.

*Id.*, at 23:16-26:25. These statements, not Reckless Ben's, are defamatory.

Finally, BAM's claim for unjust enrichment also fails. With this claim, Plaintiffs seek to recover "all profits, revenues, income and other benefits derived from [Defendants'] defamatory campaign from 11/24 to date." Compl. ¶ 209. Again, this is based on alleged defamation, which cannot be sustained. In addition, under Utah law " unjust enrichment requires the court to measure the benefit conferred on the defendant *by the plaintiff*." *Richards v. Brown*, 2009 UT App 315, ¶ 29, 222 P.3d 69 (cleaned up, emphasis added). Here, Plaintiffs do not allege that they personally conferred any specific benefit on Reckless Ben or any other defendant. Rather, Plaintiffs seek to recover profits, revenues, or income Reckless Ben may have received for his own work in creating and publishing content. Plaintiffs did not pay any of these amounts and cannot pursue an unjust enrichment claim without alleging a specific benefit *they* conferred on Reckless Ben.

## CONCLUSION

For the reasons set forth above, the Court should dismiss most of Plaintiffs' claims with prejudice, including those for RICO violations, defamation per se, defamation, false light, conspiracy, intentional infliction of emotional distress, and unjust enrichment. The Court should also award Reckless Ben all attorneys' fees and costs incurred in bringing this motion. Such an award is required by UPEPA if any part of any of Plaintiffs' claims are dismissed as a matter of law. Because multiple claims in the Verified Complaint fail for multiple reasons, fees and costs must be awarded, in addition to dismissal with prejudice.

## CERTIFICATION OF WORD COUNT

Pursuant to DUCivR 7-1(a)(6)(C), I certify that the foregoing Motion contains 7,635 words and complies with the applicable word limit under DUCivR 7-1(a)(4).

DATED this 18th day of September, 2026.

**SPENCER FANE LLP**

*/s/ Melinda K. Bowen*
R. Scott Young
Melinda K. Bowen
Hailey Winn
*Attorneys for Defendants Benjamin Paul Schneider, Reckless Ben LLC, and Victor Nguyen*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 18th day of September, 2026, I electronically filed the foregoing **DEFENDANTS BENJAMIN PAUL SCHNEIDER, VICTOR NGUYEN, AND RECKLESS BEN LLC'S SPECIAL MOTION FOR EXPEDITED RELIEF AND FOR PARTIAL DISMISSAL OF PLAINTIFFS' VERIFIED COMPLAINT** with the Clerk of the Court using the CM/ECF System:

Wm. Kelly Nash
Justin T. Rich
Mina S. Ghobrial
Dentons Durham Jones Pinegar, PC
1557 W Innovation Way, Ste. 400
Lehi, UT 84043
Kelly.nash@dentons.com
Justin.rich@dentons.com
Mina.ghobrial@dentons.com
*Attorneys for Plaintiffs*

John C. Clarke
Edward Decker
Miller Nash LLP
1140 SW Washington St., Ste. 700
Portland, OR
John.clarke@millernash.com
Edward.Decker@MillerNash.com
*Attorneys for Defendant Bryan Mansell*

*/s/ Stephanie Chavez*
Legal Assistant